UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN E. FORD,

                 Plaintiff,             Civil Action No. 16-11485
                                        Honorable Mark A. Goldsmith
v.                                          Magistrate Judge David R. Grand

RANDALL HAAS, GEORGE STEPHENSON,
MICHAEL WHITE, KRISTOPHER STEECE,
ROBERT BRANDT-LEDUC, ERIC HERBERT,
EUTRILLA TAYLOR, and JOHN KLIMOWICZ,

                 Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [73]

       Before the Court is a Motion for Summary Judgment filed on October 20, 2017, by the defendants in this action, all of whom are employees of the Michigan Department of Corrections ("MDOC") (collectively "Defendants").  (Doc. #73).  *Pro se* plaintiff Brian Ford ("Ford"), an incarcerated person, filed a response to this motion on February 20, 2018 (Doc. #97); Defendants filed a reply on March 16, 2018 (Doc. #100); and, with the Court's permission, Ford filed a sur-reply on April 23, 2018 (Doc. #103).  An Order of Reference was entered on June 6, 2016, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b).  (Doc. #10).

       Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody.  *See* E.D. Mich. L.R. 7.1(f).  Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.       RECOMMENDATION

       For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (**Doc. #73**) be **GRANTED**.

## II.    REPORT

### A.    Background

Ford is a State of Michigan prisoner who is currently confined at the Carson City Correctional Facility in Carson City, Michigan.  He brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his First, Eighth, and Fourteenth Amendment rights.  (Doc. #1).  At the time of the events at issue in his complaint, Ford was housed at the Macomb Correctional Facility ("MRF") in New Haven, Michigan, and all of the named defendants are employed by the MDOC at that facility.

In his complaint, Ford alleges that, during the summer of 2015, he – along with three other MRF inmates – filed a Prison Rape Elimination Act ("PREA") report, asserting that fellow inmate "Bourney,"[1] a member of the Gangster Disciples ("GDs") prison gang, was "trying to force [him] to have sex with others for money …."  (*Id.* at 5).  An investigation was conducted by Defendant Michael White ("Lieutenant White"), after which Borney was placed in segregation.  (*Id.*).

When Borney was released from segregation two months later, he allegedly immediately began threatening Ford again.  (*Id.*).  According to Ford, he informed Lieutenant White that he was afraid and that his life was in danger, and Lieutenant White responded by telling Ford, "You better learn how to fight."  (*Id.* at 6).  Ford further alleges that he also discussed the matter with Defendants Robert Leduc ("Inspector Leduc"), Eric Herbert ("Captain Herbert"), and George Stephenson ("Deputy Warden Stephenson"), but nothing was done.  (*Id.*).

Eventually, after Ford's repeated complaints, Borney was transferred out of MRF in

---

[1]  In their filings, the parties variously refer to this individual as "Bourney" and "Borney."  According to the MDOC's database, his correct legal name is Mychal Borney (#311168).  *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=311168 (last accessed June 20, 2018).  Thus, the Court will hereinafter refer to him as "Borney."

October 2015; just a few days later, however, on October 23, 2015, Ford was assaulted by another prisoner, Russell Richardson ("Richardson"), allegedly at Borney's direction.  (*Id.*).  Three days later, Ford sought protective custody because he was "known as a 'snitch' & had a 'green-light' (hit) on [him]."  (*Id.*).  Ford was then transferred to the Chippewa Correctional Facility ("URF").  (*Id.*).  While at URF, Ford sent a grievance back to MRF regarding Defendants' alleged failure to protect him from harm, receiving a grievance receipt, but no response.  Ford alleges that he subsequently wrote to Defendants Eutrilla Taylor ("Grievance Coordinator Taylor") and Randall Haas ("Warden Haas") about the status of his grievance, but received no response from either of them.  (*Id.* at 8).

In his instant complaint, Ford generally alleges that Defendants ignored his PREA complaint against Borney, were aware of ongoing threats to his safety, and failed to protect him from the October 2015 assault by prisoner Richardson (an alleged GD).  (*Id.* at 8).  He further alleges that the failure of Grievance Coordinator Taylor and Warden Haas to respond to his correspondence and otherwise properly process his grievance violated his due process rights, as well as his right of access to the courts.  (*Id.* at 9).  Ford sues all of the Defendants in their individual and official capacities, seeking both monetary damages and declaratory relief.  Defendants now move for summary judgment on all of Ford's claims.  (Doc. #73).

### B.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis

#### 1.    *Ford Has Not Established Sufficient Personal Involvement in the Alleged Wrongdoing on the Part of Defendants Steece or Klimowicz*

In their motion, Defendants argue that summary judgment in favor of Defendants Kristopher Steece and John Klimowicz is warranted because Ford has not sufficiently alleged their personal involvement in any purported wrongdoing.  (Doc. #73 at 22-24).  In order to demonstrate liability under § 1983 as to any particular defendant, a plaintiff must first establish that that defendant acted under color of state law and that his actions violated rights secured by the Constitution and/or laws of the United States.  *See Baker v. McCollan*, 443 U.S. 137, 140

(1979).   The plaintiff also must make a clear showing that each defendant was personally involved *in the activity that forms the basis of the complaint*.  *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).   Moreover, § 1983 liability cannot be premised upon mere allegations of *respondeat superior*, *i.e.*, supervisory liability; rather, a defendant can only be liable under § 1983 if the plaintiff shows that he personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct.  *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Bellamy*, 729 F.2d at 421.   A supervisory official's mere awareness of a complaint of allegedly illegal conduct, and his subsequent failure to take corrective action, is insufficient to trigger § 1983 liability.  *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).   Rather, liability under § 1983 must be based upon active unconstitutional behavior, not a "mere failure to act." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

In this case, although Defendants Steece and Klimowicz are named as defendants in Ford's complaint (Doc. #1 at 3), the complaint contains no factual allegations whatsoever pertaining to either of them.   Indeed, in his response to Defendants' motion for summary judgment, Ford "concedes that he made a mistake in not specifically addressing the roles played by [these two defendants]."  (Doc. #97 at 19).   Although Ford then purports to "reserve[] the right to file an Amended Complaint under Fed. R. Civ. P. 15 to specifically allege the roles of these men" (*Id.*), he does not actually move for leave to amend his complaint,[2] nor does he indicate with any degree of specificity exactly what actions Defendants Steece and/or Klimowicz

---

[2] Even if Ford had moved for leave to amend his complaint, such a request would be denied. Ford filed his original complaint more than two years ago (in April 2016), and an amended complaint several months later (in December 2016).  (Docs. #1, 37).   Discovery has now been closed for months and Defendants' motion for summary judgment is ripe for ruling.  Under the circumstances, it would be inappropriate to allow Ford to file yet another amended complaint, as it would unduly delay the progress of this case and unfairly prejudice Defendants.  *See Detrick v. Heidtman Steel Prods., Inc.*, 677 F. App'x 240, 246-47 (6th Cir. 2017).

5

allegedly took that would subject either to liability.  Ford did not name Steece or Klimowicz in his grievance related to this incident (Doc. #23 at 6), which suggests that, even at the time, he did not view them as culpable.  At this juncture, then, where Ford still has failed to point to any specific evidence demonstrating that Defendants Steece and/or Klimowicz were personally involved in or responsible for the alleged failure to protect him from prisoner Richardson's assault in October 2015, summary judgment is warranted in favor of these two individuals.

2. *Summary Judgment is Warranted on Ford's Claims against Grievance Coordinator Taylor and Warden Haas*

As set forth above, following Ford's assault by Richardson (on October 23, 2015) and his subsequent request for protective custody (on October 26, 2015), Ford was transferred from MRF to URF.  While at URF, Ford sent a grievance back to MRF; he alleges that he received a grievance receipt, but no grievance response.  (Doc. #1 at 8).  According to Ford, he then wrote to Grievance Coordinator Taylor and Warden Haas but did not receive a reply from either.  (*Id.*).  Ford now alleges that Grievance Coordinator Taylor and Warden Haas violated his Fourteenth Amendment due process rights, as well as his right to access the courts, when they failed to respond to his grievance and his follow-up requests for information.  The Court disagrees.

To begin with, Ford's Fourteenth Amendment due process claim fails because it is clear that prisoners have "no due process right to file a prison grievance or to receive responses to such grievances."  *Peterson v. Ostrander*, 2016 WL 3751681, at *2 (W.D. Mich. July 14, 2016).  Indeed, courts have repeatedly held that "there exists no constitutionally protected due process right to an effective prison grievance procedure."  *Id.* (citing cases); *see also Parker v. Donnellon*, 2011 WL 3163524, at *2 (E.D. Mich. July 27, 2011) ("[A] prisoner does not have a constitutionally-protected interest in an inmate grievance procedure or the right to an effective procedure.").  Thus, even taking as true Ford's allegations – that Grievance Coordinator Taylor

6

and Warden Haas deliberately failed or refused to respond to his grievance and/or related communications – any such failures constitute, at most, violations of MDOC policy, not of Ford's constitutional rights.

Ford also appears to assert that the alleged inaction of these defendants wrongfully deprived him of access to the courts. It is true that prisoners have a fundamental right of access to the courts. *See Hall v. Burt*, 2011 WL 2623263, at *3 (E.D. Mich. May 16, 2011) (citing *Bounds v. Smith*, 430 U.S. 817, 821 (1977)). This right is derived from the Due Process Clause of the Fourteenth Amendment and the First Amendment right to petition the government for redress of grievances. *See Knop v. Johnson*, 977 F.2d 996, 1002 (6th Cir. 1992); *Hollins v. Curtin*, 2013 WL 1703880, at *6 (W.D. Mich. Apr. 19, 2013). But, as the *Peterson* court explained in a similar case:

> A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials while leaving a formal grievance procedure intact. Indeed, Plaintiff's ability to seek redress is underscored by his pro se invocation of the judicial process. Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. The exhaustion requirement only mandates exhaustion of *available* administrative remedies. If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action.

*Peterson,* 2016 WL 3751681, at *3 (internal citations and quotations omitted) (emphasis in original).

In this case, it is clear that – even taking as true Ford's assertions that Grievance Coordinator Taylor "refused to let him exhaust his remedies" and Warden Haas "chose to also ignore [his] rights" (Doc. #97 at 19) – Ford cannot show that he has been denied access to the

7

courts in violation of his constitutional rights. Courts have recognized that "[a] prisoner asserting a denial of access to courts claim must allege that he suffered an actual injury." *Hall*, 2011 WL 2623263, at *4. To meet this requirement, "a plaintiff must show that the actions of the prison official impeded the prisoner's efforts to pursue a legal claim." *Id.* Here, the exact opposite is true: not only was Ford able to file the instant lawsuit, but he successfully opposed a prior motion for summary judgment filed by Defendants on exhaustion grounds. (Docs. #25, 32). In denying that motion, this Court specifically recognized the difficulty Ford had experienced in navigating the grievance process, noting that he "made multiple requests for a Step II grievance appeal form so he could comply with his exhaustion obligations, but that (contrary to MDOC policy) he received no response to these requests." (Doc. #25 at 7). Thus, where the Court permitted Ford to proceed with his claims, despite the alleged failure of Grievance Coordinator Taylor and/or Warden Haas to respond to his grievance and/or related correspondence, Ford simply has "failed to show any prejudice to a potentially meritorious claim." *Heddleston v. Mack*, 2000 WL 1800576, at *1 (6th Cir. Nov. 30, 2000).

For all of the foregoing reasons, summary judgment is appropriate in favor of Defendants Taylor and Haas on Ford's claims against them.

>    3.    *All of the Defendants Are Entitled to Sovereign*
>           *Immunity from Ford's Official Capacity Claims*

As set forth above, Ford has sued all of the Defendants in both their individual and official capacities. (Doc. #1 at 10). Defendants now argue that summary judgment is appropriate on Ford's official capacity claims against them. (Doc. #73 at 31-32). In support of this argument, Defendants cite to the Eleventh Amendment, which provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

8

U.S. Const. amend. XI.

The Supreme Court has held that the Eleventh Amendment proscribes suits against the state by its own citizens, as well as by citizens of another state. *See Employees of Dep't of Pub. Health & Welfare, Mo. v. Dep't of Pub. Health & Welfare, Mo.* 411 U.S. 279, 280 (1973). Furthermore, the Sixth Circuit has specifically held that MDOC employees are entitled to sovereign immunity from official capacity § 1983 claims:

> Because sovereign immunity extends to state instrumentalities, and the MDOC is an arm of the State of Michigan, the MDOC is entitled to sovereign immunity on the § 1983 claim as well. Moreover, the named Defendants, in their official capacities, are similarly entitled to immunity with respect to [Plaintiff's] § 1983 claim because a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office, which is no different from a suit against the State.

*McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010) (internal citations and quotations omitted). It is clear, then, that Ford's official capacity claims against Defendants are barred by sovereign immunity, and summary judgment as to those claims should be granted.

> 4. *Summary Judgment is Warranted on Ford's Eighth Amendment Claims against the Remaining Defendants*

In their motion, Defendants also argue that summary judgment is warranted on Ford's Eighth Amendment claims against the remaining Defendants – Lieutenant White, Inspector Leduc, Captain Herbert, and Deputy Warden Stephenson. (Doc. #73 at 12-30). Specifically, Defendants argue that Ford failed to exhaust his Eighth Amendment claim as to Deputy Warden Stephenson, and that this claim fails on the merits as to Lieutenant White, Inspector Leduc, and Captain Herbert. (*Id.*). Each of these arguments is addressed below.

> a. *Ford Failed to Exhaust His Eighth Amendment Claim against Deputy Warden Stephenson*

As set forth above, Defendants argue that summary judgment is warranted on Ford's

Eighth Amendment claim against Deputy Warden Stephenson because Ford failed to properly exhaust his administrative remedies as to this claim, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  (*Id.* at 25-30).  Under the PLRA, a prisoner may not bring an action, "under [§1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted.  42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).  This "exhaustion" requirement serves two main purposes:  it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into federal court.  *See Woodford*, 548 U.S. at 89.  The Supreme Court has held that this "exhaustion requirement requires proper exhaustion."  *Id.* at 93.  Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules[.]"  *Id.* at 90.  Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof.  *See Vandiver v. Corr. Med. Servs., Inc.*, 326 F. App'x 885, 888 (6th Cir. 2009).

In determining whether a plaintiff has properly exhausted a claim, the only relevant rules "are defined not by the PLRA, but by the prison grievance process itself."  *Jones v. Bock*, 549 U.S. 199, 200 (2007).  In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances" (the "Policy").  (Doc. #21-2).  A prisoner must first complete the process outlined in the Policy – including pursuing a grievance through "all three steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful conduct.  (*Id.* at ¶ B).  The Policy provides that if a prisoner cannot resolve his dispute with the staff member involved, he has five business days to file a Step I grievance.  (*Id*. at ¶¶ P, V).  Of note, the Policy provides that the grievance must include

the "[d]ates, times, places, **and names of all those involved in the issue being grieved**."  (*Id.* at

¶ R) (emphasis added).

If the prisoner is dissatisfied with the Step I response, he may appeal to the Step II

Grievance Coordinator within ten business days after receipt of the Step I response, or if no

timely response is received, within ten business days of the date the response was due.  (*Id.* at ¶

BB).  If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten

business days within which to file a final appeal at Step III.  (*Id.* at ¶ FF).  Again, an inmate may

only pursue a claim in court if he has complied with his obligations at each of these three steps.

(*Id.* at ¶ B).

In their motion, Defendants argue that Ford has not properly exhausted his Eighth

Amendment claim against Deputy Warden Stephenson because he did not name him in the only

grievance he filed related to the claims at issue in this case.  (Doc. #73 at 29-30).  Indeed, in the

relevant grievance, dated October 27, 2015, Ford asserts as follows:

> A few months ago, I filed a PREA complaint on prisoner Borney (several
> people did).  Borney was placed in seg[regation].  After about 2 m[on]ths,
> Borney was released from seg[regation] & returned to G.P. [general
> population].  This immediately placed my life in danger because Borney is
> a known "GD" gang member & knew I had filed the PREA.  After several
> threats, I went to Arus M. Williams for help.  Ms. Williams was finally
> successful in transferring Borney, but not before he was able to place a hit
> on me.  I spoke with Capt. Herbert, Lt. White & Inspector Laduc several
> times about Borney being back in G.P. & using his gang to intimidate me.
> Soon after Borney's transfer, a "GD" assaulted me on 10-23-15.  On 10-
> 26-15, after being circled up by the gang twice, I was forced to seek PC
> [protective custody].  On 10/27/15, at 7:45 A.M., Lt. White told me, "I
> knew the hit was coming, I just didn't know when."  There are several
> prisoner witnesses.  MRF Administration knowing[ly] placed my life in
> danger & took no action to prevent the assault….

(Doc. #23 at 6).  There can be no dispute, then, that in the only relevant grievance, Ford named

only four individuals – Captain Herbert, Lieutenant White, Inspector Leduc, and ARUS

11

Williams.[3]  He did not, however, name Deputy Warden Stephenson or allege any wrongdoing on his part.

As set forth above, the Policy specifically requires that "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included" in the prisoner's written grievance.  (Doc. #21-2 at ¶ R).  In general, a plaintiff "fails to exhaust administrative remedies by failing to include an official's name in a grievance if it is required by the applicable grievance procedures[.]"  *Hall v. Warren*, 443 F. App'x 99, 106 (6th Cir. 2011).  But, because the purpose of the exhaustion requirement is to "give the defendants fair notice that the grievance [is] directed against them," a court "may excuse a prisoner's failure to identify by name a particular defendant in a grievance when it is obvious from the facts alleged in the grievance that the defendant was involved."  *Vandiver*, 326 F. App'x at 890; *Calhoun v. Hill*, 2008 WL 4277171, at *3 (E.D. Mich. Sept. 17, 2008) (citing *Binion v. Glover*, 2008 WL 4097407, at *4 (E.D. Mich. Aug. 29, 2008)); *see also Emerson v. Ingraham*, 2011 WL 3813108, at *3 (W.D. Mich. July 26, 2011) (suggesting that, if a prisoner is unable to "name" a defendant in a grievance, an indication of the individual's "involvement in the issue being grieved" is adequate to meet exhaustion requirements).

Here, Ford concedes that he did not specifically name Deputy Warden Stephenson in his grievance; he argues, however, that he "cited 'MRF Administration,'" which he claims included Stephenson.  (Doc. #97 at 20).  The problem for Ford, however, is that it is not at all "obvious from the facts alleged in the grievance that [Deputy Warden Stephenson] was involved."  *Vandiver*, 326 F. App'x at 890.  Nor is it obvious that, in addition to the four individuals specifically named in the grievance, Ford intended to accuse an additional, unnamed defendant

---

[3] ARUS Williams is not a named defendant in this action.  Moreover, Ford does not allege any wrongdoing on her part in the grievance; to the contrary, he states that ARUS Williams was successful in transferring Borney out of MRF.  (Doc. #23 at 6).

of failing to protect him.

Cases in which courts have found claims exhausted against defendants who were not specifically named in the relevant, underlying grievance have done so on far different facts from those present in this case.  For example, in *Burton v. Kakani*, 2009 WL 3101046, at *2 (E.D. Mich. Sept. 23, 2009), the court found the plaintiff's claim properly exhausted, despite the fact that the individual defendants were not specifically named in the grievance, where the grievance in question was expressly directed to "the P.A." and "the Doctor."  In that case, the defendants did not allege that any physician's assistant or doctor – other than themselves – was assigned to the prison at the time in question.  Thus, the court found that the plaintiff provided sufficient information in his grievance for the MDOC to determine the identities of the P.A. and doctor being grieved.  *Id.*  Here, however, Ford did not merely vaguely assert that certain unidentified members of "MRF Administration" failed to protect him from assault.  Rather, he named four specific individuals in his grievance, and gave no indication that he believed others to also be culpable.  Given these facts, Ford's reference to "MRF Administration" in his grievance – which, by his own admission, encompasses all four of the named individuals (Doc. #97 at 20) – is insufficient to put the MDOC on notice of Deputy Warden Stephenson's alleged involvement in the events at issue.  *See Coleman v. Rich*, 2015 WL 9897751, at *6 (W.D. Mich. Dec. 30, 2015) (finding that plaintiff did not exhaust his claims against the named defendants where the only individuals specifically named in the grievance were non-parties; additional references to unnamed guards, unknown individuals, "medical staff," and "medical personnel" were insufficient to put the MDOC on notice that the defendants named in the lawsuit were involved in the conduct at issue).

Ford further argues that, because the MDOC did not "contest" his reference to "MRF

Administration" but, rather, processed his grievance at Step I, Defendants cannot now claim that he failed to exhaust as to Deputy Warden Stephenson. (Doc. #97 at 20-21). It is true that, under some circumstances, where prison officials consider the merits of a grievance – rather than rejecting it on procedural grounds – courts are not persuaded by *post hoc* arguments that a grievance failed to comply with all of the Policy's requirements. *See, e.g., Grear v. Gelabert*, 2008 WL 474098, at *2, 7-8 (W.D. Mich. Feb. 15, 2008) (where grievance filed against "health care staff" was not "rejected for failure to name any individual persons" – but, rather, was considered on the merits – defendants' failure to exhaust argument was rejected).

In this case, had Ford grieved *only* "MRF Administration," and failed to name any specific individuals allegedly at fault, the Court might be persuaded that, because the grievance was processed on its merits, any argument that it was procedurally defective was waived. But, Ford named four specific individuals in his grievance, thus at least facially complying with the Policy's requirement that he provide the names of "all those involved in the issue being grieved." (Doc. #21-2 at ¶ R). He did not indicate that there were additional staff members whose identities were unknown to him who engaged in the conduct at issue in the grievance. Moreover, as Ford acknowledged, the four individuals he named in the grievance were, in fact, members of "MRF Administration" (Doc. #97 at 20); thus, there was no reason for the MDOC to suspect that, by including this reference in his grievance, Ford was intending to complain of wrongdoing by other unnamed and unmentioned individuals. Given all of these facts, there simply was no reason for the MDOC to "contest" Ford's grievance as failing to comply with the Policy's requirements, and the Court cannot conclude that, by processing Ford's grievance on the merits, Defendants waived the procedural argument they now advance. *See, e.g., Lewis v. Spitters*, 2015 WL 5682405, at *5 (W.D. Mich. Sept. 18, 2015) (where prisoner plaintiff filed

grievances against certain named prison officers, and subsequently named additional prison officers as defendants, court rejected his argument that he was unaware of the additional defendants' names at the time he submitted his grievances, finding that plaintiff was still "obliged to indicate in his grievance that the matter was being pursued against additional individuals whose identities had not yet been ascertained").

For all of these reasons, Defendants have shown that Ford failed to exhaust his Eighth Amendment claim against Deputy Warden Stephenson, so this portion of Defendants' motion for summary judgment should be granted.

> b.   *Ford's Eighth Amendment Claim Fails on the Merits as against Lieutenant White, Inspector Leduc, and Captain Herbert*

Lastly, the Court must consider the merits of Ford's Eighth Amendment claim against Lieutenant White, Inspector Leduc, and Captain Herbert.  Essentially, Ford alleges that these three individuals violated his Eighth Amendment rights by failing to protect him from the assault by Richardson, despite their knowledge that he was at substantial risk of serious harm.

The Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is reasonable safety."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (internal quotation omitted).  Prison officials have a duty to protect prisoners from violence at the hands of other prisoners, and officials may be held liable if they know of and disregard an excessive risk to an inmate's health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 833, 837 (1994).

To sustain a claim under the Eighth Amendment for a prison official's failure to provide protection from danger, an inmate must show that the official was deliberately indifferent to a "substantial risk of serious harm."  *Id*. at 828.  Deliberate indifference is a "stringent standard of fault …."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To prevail on such a claim, a plaintiff must present evidence from which a trier of fact could conclude "that the defendant: (1) had

actual knowledge of facts from which the inference could be drawn that a substantial risk of serious harm existed; and (2) actually drew the inference" that there was a substantial risk of harm. *Taylor v. Little*, 58 F. App'x 66, 67 (6th Cir. 2003); *see also Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) ("The concept of 'deliberate indifference' encompasses both a subjective and an objective component.").  In order to satisfy the subjective prong, the defendants' "conduct must … be 'obdurate' or 'wanton' – exhibiting recklessness or callous neglect."  *Nelson v. Overberg*, 999 F.2d 162, 165 (6th Cir. 1993) (quoting *Whitley v. Albers*, 475 U.S. 312, 318 (1986)).

Ford's complaint[4] alleges the following facts in support of his Eighth Amendment claim:

> During the summer months of 2015, while at the Macomb Corr. Fac., several inmates (including myself) went to the control center & filed individual "PREA" complaints against a prisoner "Borney."  (Borney was trying to force us to have sex with others for money, which he would collect in exchange for his allowing us to "stay on the yard" & for "protection."  Borney has two aliases:  "Solo" & "Hustle-G" & is a member of the GD's or Gangster Disciples gang.)

> Lt. White took the reports & was in charge of the investigation.  Approximately a month later, after we continued to report increasing threats from Borney, Lt. White finally had Borney placed in segregation (seg.).

> For the first couple weeks that Borney was in seg., the GD's approached me & the others several times & confronted us with letters Borney was sending out to his gang members.  Because there was no definitive proof of us "telling," the GD's left it alone – until Borney returned to [general] population (G.P.).

> About 2 months later, Borney was released from seg & placed back in G.P. in the same unit as all of us who filed the PREA reports.  Upon his return, he made it well known to the population that we "all told on him" & "had to go."  Borney claimed that Lt. White provided him with all of our names from the reports.

---

[4] All of these alleged facts are also set forth in Ford's affidavit, which he submitted to the Court with his response to Defendants' motion for summary judgment.  (Doc. #97 at 4-10).  The Court quotes from the complaint because Ford's factual allegations are set forth more concisely in that pleading.

The threats from the GD's began immediately.  I & several others went to our counselor, Arus M. Williams.  She was shocked to find out Borney was back in the unit.  She then called Inspector Steece, e-mailed Lt. White & spoke with Deputy Stephenson in person.  She expressed her concerns about our lives being put in jeopardy.  Ms. Williams then told us all that she would transfer Borney.

About a week later, the counselor called me out & told me that Lt. White & Deputy Stephenson made the decision to release Borney & that "the institution" would not let her transfer Borney.

Several times over the next few weeks, I went to Lt. White (in the chow hall at meal times) & reported the increasing threats from Borney & the GD's.  I repeatedly expressed that I was afraid & all our lives were in danger.  Lt. White told me, "You better learn how to fight."  I went to Ms. Williams nearly every day about the issue.  She arranged for me to go see Inspector LaDuc [sic].  All he said was, "it's not my choice.  There's nothing I can do."

As I was a "unit representative," an elected position, I had access to Capt. Herbert & Deputy Stephenson.  I went to the control center several times & spoke to Capt. Herbert.  "I'll look into it" was <u>ALWAYS</u> his response.  I took the issue to Deputy Stephenson [TWICE] to no avail.

It was my counselor, Arus Michelle Williams-Ward who was finally successful in having Borney transferred.  However, only days after his transfer, on 10/23/15, I was assaulted by the GD's.  When "Russell" [Richardson] assaulted me, he yelled, "That's for Hustle-G, bitch!"  My cell mate was present & defended me.

That same night, while walking to med-line to take my psych meds, the GD's surrounded me & told me to leave.  On 10/24/15, while in the unit dayroom, several GD's again circled me up.  I feared for my life to such a degree that I was forced to knock loudly on a window to get Officer Spezia's attention.  He made the GD's leave the dayroom because 1) they were threatening me & 2) they weren't even suppose[d] to be out of their cells at the time.  As C/O Spezia witnessed this, we both told C/O Artman & day shift the next day.  On the 24th, 25th, & 26th, I did not go to chow because I was so afraid.  After several GD's came to my cell door threatening me, I finally sought protective custody on 10/26/15.  I was known as a "snitch" & had a "green-light" (hit) on me.

On 10/27/15, at about 7:45 A.M., Lt. White did a round in seg.  He stopped at my door.  He said, "I knew the hit was coming, I just didn't know when."  Several prisoners seen [sic] & heard Lt. White's statement

17

to me.[5]

(Doc. #1 at 5-7) (emphasis in original) (footnote added).

In their motion for summary judgment, Defendants dispute these allegations in many respects.  Specifically, both Captain Herbert and Inspector Leduc executed affidavits denying that they failed to take action to protect Ford from harm, despite his warnings that an assault by Borney and/or the GDs was imminent.  (Doc. #73 at Ex. C, ¶¶ 4-5; Doc. #75-1 at ¶¶ 4-6).  Similarly, Lieutenant White executed an affidavit, in which he acknowledges receiving Ford's PREA complaint against prisoner Borney on August 8, 2015.[6]  (Doc. #73 at Ex. A, ¶ 4).  However, White denies Ford's allegations (a) that Borney remained in general population for nearly a month after the PREA complaint was received, saying that he was placed in Temporary Segregation on August 17, 2015; (b) that Borney was a member of the GDs, saying he was "not an [sic] Security Threat Group (STG) prisoner"; (c) that he responded to Ford's reports of threats

---

[5] Ford's response to Defendants' motion for summary judgment attached affidavits from prisoners Brian Bourne and Nelson Page, both of whom averred that Lieutenant White did in fact make this statement.  (Doc. #97 at Ex. W, Z).  However, neither affidavit contains any information suggesting that White should have anticipated the assault by Richardson.

[6] Defendants argue, in part, that Ford's deliberate indifference claim fails because he was offered (and declined) protective custody after filing the PREA complaint.  (Doc. #73 at 21).  Specifically, Lieutenant White avers that, after receiving Ford's PREA complaint against Borney, he offered Ford protective custody, which Ford "declined and signed a written waiver to that effect" on August 8, 2015.  (*Id.* at Ex. A, ¶ 4).  In response to Defendants' motion for summary judgment, however, Ford attests that when Lieutenant White asked him to sign this waiver, and he did so "under duress" and only because he was "told by Lt. White that the waiver was only temporary – just until the next day at the latest, he said – when he would place Borney in segregation (seg)."  (Doc. #97 at 4, 8).  Ford further avers that, two days later, when Borney had not yet been placed in segregation, he wrote a letter to Deputy Warden Stephenson, Inspector Leduc, Captain Herbert, and Lieutenant White "formally withdrawing the protection waiver [he] signed, & also request[ing] protection."  (*Id.*).  Ford claims that all four of these individuals ignored this letter.  (*Id.*).  In their reply brief, Defendants argue that Ford's assertions in this respect are little more than an eleventh hour attempt to avoid summary judgment.  (Doc. #100 at 1-5).  While the Court finds Defendants' arguments on this issue persuasive, it need not determine whether, in fact, Ford revoked his waiver of protective custody because, even taking these allegations as true, Ford never claims he was seeking protection from Richardson.

from Borney and other GDs by saying "you better learn how to fight"; and (d) that, after Ford was assaulted, he told Ford "I knew the hit was coming, I just didn't know when." (*Id.* at Ex. A, ¶¶ 5-10).  Even construing these factual disputes in Ford's favor, he has presented insufficient evidence that Defendants acted with deliberate indifference to his safety.

Specifically, after Ford (and three others) filed a PREA complaint against Borney, Borney was placed in segregation.   Ford asserts that, after Borney was released from segregation, he went to Lieutenant White several times and "reported the increasing threats from Borney & the GD's"; "repeatedly expressed [to Lieutenant White] that [he] was afraid & that all our lives were in danger"; and spoke with both Captain Herbert and Inspector Leduc "about the danger [his] life was in due to threats from Borney & the GD's."  (Doc. #97 at 5-6).  But, nowhere does Ford allege, let alone present evidence from which one could find, that Lieutenant White, Captain Herbert, and/or Inspector Leduc were aware of a substantial risk that he would be attacked by Richardson, or that they knew Richardson was a member of the "GD's."  Indeed, the evidence is to the contrary.  Defendants came forward with the affidavits of Lawrence Brown and Kristopher Steece, both of whom attest that Richardson is not designated as a member of a Security Threat Group ("STG"), such as the GDs.  (Doc. #79 at Ex. B, ¶ 4; Ex. C, ¶ 6).  And, while Ford points to evidence in the record showing that Richardson was found in possession of "STG related materials" (*Id.* at Ex. C, ¶¶ 6, 7), this did not occur until April 28, 2016, many months after Richardson attacked Ford (Doc. #80 at Ex. C-1).  Finally, Ford admitted at his deposition that he himself had no reason to suspect an attack by Richardson.  (Doc. #73 at Ex. E, pp. 33-34).  In fact, Ford testified that he and Richardson had a very positive relationship:

> I used to make different types of candy and banana bread and stuff like that
> [at MRF] . . . and Russell [Richardson] was a consistent customer, so we
> were always doing business together but it was always positive.  It was
> never anything negative.  We had never even had a bad word before [the

assault].

(*Id.*).

In similar cases, courts have rejected Eighth Amendment claims where there was a lack of evidence at the summary judgment stage to establish the defendant's subjective awareness of a risk of harm.  For example, in *Lewis v. Richards*, 107 F.3d 549, 551 (7th Cir. 1997), the plaintiff was beaten and sexually assaulted by two members of the GDs; subsequently, he reported the rape, requested protection from those two inmates, and informed prison authorities that his attackers were members of the GDs gang.  A few weeks later, the plaintiff was again sexually assaulted by two different inmates, both also allegedly members of the GDs.  In rejecting the plaintiff's Eighth Amendment failure to protect claim, the court noted that, prior to the second attack, the plaintiff did not "specifically seek protection from the two inmates who assaulted him on that occasion"; thus, he "did not demonstrate that the defendants had specific knowledge of a threat to [him] by the inmates who assaulted him."  *Id.* at 553.  The *Lewis* court also considered and rejected the plaintiff's argument that, by making prison officials aware that he was being targeted by the GDs and requesting protective custody, the plaintiff had made the defendants aware of a substantial risk of serious harm, saying:

> Lewis did present sworn testimony that when he reported the first attack …, he made prison officials aware that the Disciples had targeted him, and had requested but was refused protective custody.  Therefore, he argues, any subsequent attack by a member of the gang suffices to establish that defendants were deliberately indifferent to his safety.  We disagree.

*Id.* at 553-54.  Thus, where the plaintiff "did not demonstrate that the defendants had specific knowledge of a threat to [him] by the inmates who assaulted him[,]" summary judgment was warranted.  *Id.* at 553.

Similarly, in *Carter v. Galloway*, 352 F.3d 1346, 1348 (11th Cir. 2003), the plaintiff was temporarily placed in administrative segregation where, over his protests, he was assigned to

share a cell with Inmate Barnes, who had a history of violence while incarcerated.  Subsequently, the plaintiff complained to the defendant officer that Barnes was "acting crazy," planned on "faking a hanging," and that he had told the plaintiff that he would have to help with the hanging "one way or another" (which the plaintiff interpreted as a threat).  *Id.*  A few days later, Barnes stabbed the plaintiff in the stomach with a shank, and the plaintiff filed suit, alleging failure to protect.  In affirming a grant of summary judgment, the court found a lack of sufficient evidence to establish the defendants' subjective awareness of a substantial risk of serious harm to the plaintiff, saying:

> During Plaintiff's time as a cellmate of Inmate Barnes, Defendants clearly knew that Inmate Barnes was a "problem inmate" with a well-documented history of prison disobedience and had been prone to violence. Defendants also had specific notice from Plaintiff that Inmate Barnes acted crazy, roaming his cell like a "caged animal."  But before Defendants' awareness arises to a sufficient level of culpability, there must be much more than mere awareness of Inmate Barnes's generally problematic nature.

*Id.*  Thus, where "Plaintiff never told [the defendant] that Plaintiff feared Barnes or that Barnes clearly threatened Plaintiff[,]" the court found that any "generalized awareness of risk" did not satisfy the subjective awareness requirement.  *Id.* at 1350.

Finally, in *Miller v. McBride*, 64 F. App'x 558, 559 (7th Cir. 2003), the plaintiff sued prison officials for failing to protect him from other prisoners, "particularly those in the notorious Gangsters Disciples gang."  In that case, the plaintiff informed prison staff that he had been threatened by several GDs (who he identified by name) and requested protective custody (which was granted).  A few months later, prisoner Grandberry (an alleged member of the GDs but not one of those the plaintiff had previously identified) transferred into the same protective custody dorm.  A couple of days later, the plaintiff and Grandberry argued about a missing book, at which point Grandberry punched the plaintiff in the face several times and hit him over the

head with a padlock.  In rejecting the plaintiff's allegation that the defendant officials failed to

protect him from Grandberry's attack, the court reasoned:

> As for the fight with Grandberry, there is no evidence that any of the
> defendants knew that Grandberry posed a threat to Mr. Miller.  Mr. Miller
> did not alert any staff members to the potential danger upon learning that
> Grandberry had asked about him nor did he inform staff that he intended
> to confront Grandberry about the missing book.  Although Mr. Miller had
> reported threats from other Gangster Disciples (and assuming that prison
> staff even knew that Grandberry was affiliated with the Gangster
> Disciples), the defendants could not be expected to know that Grandberry
> *in particular* posed a threat to Mr. Miller, as he had never identified
> Grandberry as an antagonist in the past.  In fact, Mr. Miller admitted
> during his deposition that even he did not expect a fight with Grandberry.

*Id.* at 561 (emphasis in original).  *See also Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir.

2014) (summary judgment appropriate on failure to protect claim where "there were no

longstanding, pervasive, well-documented, or previously noted tensions between [the plaintiff

and his attacker]").

As in the foregoing cases, summary judgment is warranted here in favor of Lieutenant

White, Captain Herbert, and Inspector Leduc because the evidence establishes that they had no

knowledge that prisoner Richardson posed a substantial risk of serious harm to Ford.  Rather, the

evidence establishes that, after Ford (and others) filed the PREA complaint against Borney,[7]

action was taken to place Borney in segregation.  Ford avers that, after Borney returned to

general population, he went to Lieutenant White several times and "reported the increasing

threats from Borney & the GD's"; "repeatedly expressed [to Lieutenant White] that [he] was

afraid & that all our lives were in danger"; and spoke with both Captain Herbert and Inspector

---

[7] Part of Ford's Eighth Amendment claim rests on an allegation that Lieutenant White "provided
Borney with the identities of everyone, including Ford's, who filed PREAs against him."  (Doc.
#97 at 16).  But, the only evidence Ford offers in support of this allegation consists of hearsay
statements (*Id.* at Ex. AA) which cannot be used to create a genuine dispute of material fact.  *See
King v. Alexander*, 574 F. App'x 603, 606 (6th Cir. 2014).  Moreover, Ford was assaulted by
Richardson, not Borney.

Leduc "about the danger [his] life was in due to threats from Borney & the GD's." (Doc. #97 at 5-6).  But, even taking all of these averments as true, they are simply too vague to have put Defendants on notice that there was a substantial risk that Richardson[8] was going to attack Ford. Rather, most of Ford's reports centered on threats from Borney, and Borney was placed in segregation, and transferred out of MRF before the attack by Richardson occurred.  (Doc. #103 at 1).  If anything, then, the evidence suggests that MRF officials took steps to abate the risk Borney reportedly posed to Ford.

Regardless, where Ford never expressed concern about or fear of Richardson prior to the October 2015 assault, and where the record evidence actually shows the two appeared (even to Ford) to enjoy a positive relationship, the Court finds that Ford failed to raise a genuine issue of material fact that Lieutenant White, Captain Herbert, and/or Inspector Leduc knew of and intentionally disregarded an excessive risk to his safety that resulted in the assault in question. *See Miller*, 64 F. App'x at 561 (noting prisoner's own testimony that "even he did not expect a fight with [his assailant].").  At most, Richardson's assault on Ford was a sudden and isolated incident that these three defendants cannot be liable for under the deliberate indifference standards discussed above.  As a result, summary judgment is warranted.[9]

### III.   CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment (**Doc. #73**) be **GRANTED**.

---

[8] Ford has repeatedly claimed that prisoner Richardson "attacked [him] on orders of the GD's, on behalf of Borney."  (Doc. #97 at 8).  But, as explained above, he has failed to establish that Lieutenant White, Captain Herbert, and/or Inspector Leduc knew that Richardson was a GD or had been ordered to assault Ford.

[9] Defendants also argue that summary judgment is warranted on qualified immunity grounds.  (Doc. #73 at 32-33). Determining the applicability of qualified immunity requires a two-step inquiry into whether the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that:  (1) the defendant violated a constitutional right; and (2) the right was clearly established.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Here, where Ford has failed to establish a genuine issue of material fact as to a constitutional violation occurred, the Court need not reach Defendants' qualified immunity arguments.

Dated: June 22, 2018                          s/David R. Grand

Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of objections must be served upon the Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 22, 2018.

                                              s/Eddrey O. Butts
                                              EDDREY O. BUTTS

24

Case Manager